**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RONDA NUNNALLY | ) |
| | ) |
| Plaintiff, | ) **Civil Action No. 1:08-cv-01464-PLF-DAR** |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| _____ | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT**
**OF HER MOTION FOR SANCTIONS AGAINST DEFENDANT**
**ASSOCIATED WITH ITS SPOLIATION OF EVIDENCE**

Plaintiff files the instant motion because of Defendant District of Columbia's

failure to preserve and/or its destruction of relevant emails and other documents related to

material issues in this case. The initial Complaint, filed in this case on August 22, 2008

and subsequently amended on November 26, 2008, May 7, 2009, May 21, 2010 and April

13, 2011, contains claims against Defendant District of Columbia associated with

retaliatory actions taken by Defendant against Plaintiff Ronda Nunnally involving

protected activities in which she engaged. Plaintiff names certain current and former

Metropolitan Police Department and other employees and certain other D.C.

agencies/departments in her Complaints, who she asserts took retaliatory actions against

her and/or failed to act in response to complaints of retaliatory actions taken against her,

to-wit, *inter alia*: former EEO official Jacqueline Johnson (Soares), Plaintiff's former

supervisor Phillip Graham, Lieutenant Edward Delgado, Commander Mark Beach, the

Metropolitan Police Department's ("MPD") Internal Affairs Division, Captain David

Kamperin, Commander Thomas McGuire, Assistant Chief of Police Winston Robinson,

1

the Police and Firefighters Retirement Relief Board ("Retirement Board") and Assistant Chief of Police Diane Groomes.

Plaintiff, moreover, filed discrimination and retaliation complaints with the D.C. Office of Human Rights ("OHR") on July 12, 2004, in the D.C. Superior Court on July 28, 2004 and again with the OHR on May 25, 2007. Plaintiff also filed several internal complaints with MPD's Equal Employment Opportunity Branch ("EEO") and Internal Affairs Division ("IAD") concerning the retaliation to which she had been subjected and supplemented same on numerous occasions. Notwithstanding the foregoing, as well as the well-established mandate concerning the preservation of evidence by a party anticipating litigation,[1] Defendant has failed to preserve innumerable emails and other documents that contain information relevant to the instant litigation. *See, e.g., D'Onofrio v. SFX Sports Group, Inc.*, Civil Action No. 06-0687, 2010 U.S. Dist. LEXIS 86711, 2010 WL 3324964 (D.D.C. Aug. 24, 2010) (quoting *Smith v. Café Asia*, 246 F.R.D. 19, 21 n. 2 (D.D.C. 2007)). "'Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'" *Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.C. 2011) (*quoting Zubalake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)).

A party to a lawsuit has "an obligation to preserve and also not to alter documents it knew or reasonably should have known were relevant . . . if it knew the destruction or

---

[1] See, e.g., Arista *Records, Inc. v. Sakfield Holding Co.*, 314 F. Supp.2d 27, 34 n.3 (D.D.C. 2004) (litigants have a duty to preserve what they know or reasonably should know "is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.")

alteration of those documents would prejudice [its opponent]." *Shephard v. Am. Broad. Cos.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995). This obligation arises "once [the party] anticipates litigation." *Café Asia*, 246 F.R.D. at 21 n.1 (D.D.C. 2007). If a party does not preserve this evidence, the party "runs the risk of being justly accused of spoliation and may find himself the subject of sanctions." *Id.* If a party either destroys or does not preserve prospective evidence associated with litigation that is foreseeable, that party may be found to have engaged in the "spoliation of evidence," and a court may impose a sanction associated therewith. *See Jackson v. Fedders Corp.*, No. 94-0344, 1996 U.S. Dist. LEXIS 7306 (D.D.C. May 21, 1996).

A party's destruction of evidence qualifies as willful spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotation marks and citation omitted). Furthermore, because "the relevance of ... [destroyed] documents cannot be clearly ascertained because the documents no longer exist," a party "can hardly assert any presumption of irrelevance as to the destroyed documents." *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982), *cert. denied*, 461 U.S. 937 (1983).

With respect to the instant case, undersigned asked numerous deponents whether they were instructed to preserve documents associated with this litigation. Former Commander and now Captain Mark Beach, referenced above as among those discussed in the Complaints (initial and amended), responded as follows to the undersigned's question, "Were you ever instructed or requested to hold on to documents or voicemail messages associated with this matter?" A: "No." Beach Trans. at 15. Former Inspector

and current Captain Edward Delgado answered, in response to the undersigned's question, "Were you ever asked by anyone to place documents or emails on hold associated with any litigation filed by Ms. Nunnally?" A: "No. I don't recall that." Delgado Trans. at 23. When asked if he recalled receiving an instruction to keep documents associated with a lawsuit and not destroy them, former Captain David Kamperin, a retired Commander, responded, "I don't recall that, no." Kamperin Trans. at 66. Deponent Ted Zalewski, a named Defendant in the initial Complaint and former civilian Director of the First District of MPD, where Plaintiff complained she had been unlawfully retaliated against, similarly responded in his deposition that he did not recall having been instructed to hold on to "documents or emails" associated with Plaintiff. Zalewski Trans. at 33. Although Defendant's 30(b)(6) Internal Affairs Department witness, Lieutenant Samuel Golway, testified that he believed that a litigation hold had been initiated involving the instant case, he indicated that he did not know when such a hold was placed nor when his Department became aware of the instant litigation. Golway 30(b)(6) Trans. at 9-10. 30(b)(6) designee Sergeant Nicole Webster testified that she was unaware of any instructions to put Nunnally-related documents on hold or not to delete or destroy them. Webster 30(b)(6) Trans. at 93. 30(b)(6) Police Clinic and Retirement Board designee William Sarvis similarly testified, in response to a question concerning whether his office was instructed to put documents on hold or to otherwise not destroy documents associated with Ms. Nunnally's litigation, "No, sir." Sarvis 30(b)(6) Trans. 70-71.

## SUMMARY OF PLAINTIFF'S CLAIMS

In her Fourth Amended Complaint, Plaintiff alleges that she was retaliated against after having made protected disclosures under the D.C. Whistleblower Protection Act, as

4

amended, D.C. Code § 1-615.54 *et seq.,* and for engaging in protected activities in violation of the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.* and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.* In summary, Plaintiff alleges in her Fourth Amended Complaint that: her EEO complaint(s) against her supervisor Phil Graham, which were sustained by Defendant's EEO office, were not kept confidential by Defendant; she was detailed and transferred to a utility closet office against her will after filing her EEO complaint(s); she was assigned menial duties not appropriate for a D.C. Metropolitan Police Department (MPD) Lieutenant; she was and continues to be barred from MPD Headquarters; her supervisors, inferiors and other colleagues were instructed to target her and/or attempt to find any wrongdoing on her part; she was given negative performance evaluations that were not based on her actual performance and in retaliation for her engaging in protected activities, which severely restricted her ability to apply for or obtain other positions or details; her office was broken into on numerous occasions; she rescued an officer from a burning car and was subsequently investigated rather than awarded for same; she was assaulted and threatened by a colleague who was not punished therefor; she was given assignments by a subordinate; Defendant failed to investigate her continued complaints of retaliation; several attempts were made to break into her computer; a colleague was directed to search her computer and that of her superior who refused to retaliate against Plaintiff (despite instructions that he (the superior) do so) in an attempt to find negative information on either or both; her inferiors were encouraged by a superior to file complaints against her; her private medical and psychological records were distributed among her colleagues and subordinates; even after her supervisor had been terminated

5

due to his sexual harassment of her and his creation of a hostile work environment, she was not permitted to return to the department or position in which she worked for years prior to her EEO complaint(s); she was not permitted to participate in the selection of personnel who would work under her; she was denied purchase order authority, which authority was instead given to her subordinate; she was denied the opportunity to direct assignments and tours of duty to her subordinates; she was repeatedly retaliated against for "blowing the whistle" regarding, *inter alia*, criminal wrongdoing engaged in by several MPD officials and members by testifying before the D.C. City Council, complaining to Delegate Eleanor Holmes Norton, then Mayor-Elect Adrian Fenty, U.S. Senator Barbara Mikulski, MPD's Internal Affairs Division (IAD) and D.C.'s Inspector General's Office; she was denied advanced annual, sick and Family and Medical Leave Act leave and workers' compensation; and when she was eventually retired, she received the lowest level of retirement benefits available.

## ARGUMENT

"Even without a specific preservation order, a party has a duty to preserve potentially relevant evidence; once a party is on notice that litigation has been filed, courts uniformly impose such an obligation." *Arista Records*, 314 F. Supp.2d 27, 34 n.3. A party's duty to preserve material evidence arises before litigation, and in particular "when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001); *see also Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'") (*quoting United*

*States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002))).

Despite the fact that Defendant was fully aware of the pending and, at a minimum, impending litigation, as well as the internal and OHR complaints (cross-filed with the EEOC) and 2004 D.C. Superior Court litigation alleging discrimination and retaliation, referenced *supra*, Defendant appears to have taken no steps to preserve documents and instead appears to have permitted the repeated deletion of emails and destruction or non-retention of documents before and/or during the instant litigation.

Fed. R. Civ. Pro. 37(e) is worth distinguishing here, as it would otherwise appear to be a potential safe harbor for Defendant if Defendant argues that the missing emails and attendant documents may have been destroyed resulting from the operation of a routine, good-faith electronic information system. As stated in *Disability Rights Council of Greater Wash. v. Wash. Metro. Transit Auth.*, 242 F.R.D. 139, 146 (D.D.C. 2007), which references the Federal Rules of Civil Procedure's Advisory Committee's notes on 37(e), "it is clear that this Rule does not exempt a party who fails to stop the operation of a system that is obliterating information that may be discoverable in litigation." The Advisory Committee's notes associated with the 2006 amendments that created the current version of Rule 37(e), moreover, carves out an important exception: "A preservation obligation may arise from many sources, including common law, statutes, regulations, or a court order in the case. The good faith requirement of [Rule 37(e)] means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve. When a party is under a duty to preserve information because of pending or reasonably anticipated litigation,

intervention in the routine operation of an information system is one aspect of what is often called a 'litigation hold.'" In any case, Fed. R. Civ. Pro. 37 appears to be inapplicable to the destruction of documents before the commencement of litigation; as such, courts must rely on their inherent power to punish document destruction when documents are destroyed before the commencement of litigation. 17-15 Bender's Forms of Discovery Treatise § 15.142.

The primary basis for Plaintiff's argument concerning the deletion of emails[2] and destruction of and/or failure to retain other documents follows. Plaintiff herself has produced numerous emails concerning the matters at issue in this litigation to, from and/or cc'd to MPD email accounts, but these are only emails that Plaintiff happened to print out or otherwise retain before her retirement from MPD in 2010. Plaintiff has produced a significant number of emails to, from and/or cc'ing MPD recipients, including associated with the email addresses listed below, hundreds of which Defendant – which had possession, custody and control over those email addresses – did not produce. Furthermore, on January 25, 2012, counsel for Defendant emailed the undersigned concerning email mailboxes Defendant agreed to search for references to Plaintiff, Ronda Nunnally. Those email boxes, as listed by counsel for Defendant, were as follows:

      (1) ted.zalewski@dc.gov
      (2) edward.delgado@dc.gov
      (3) David.kamperin@dc.gov
      (4) mark.beach@dc.gov
      (5) melvin.gresham@dc.gov

---

[2] These emails go to the core of Plaintiff's claims: they would indicate who knew about Plaintiff's protected activities, as well as when, how and what action(s) they took or that were taken against them with respect to same. These documents would also provide information concerning motive, bias, credibility and pretext. Defendant has provided some emails, but Plaintiff has produced far more relevant emails to and from pertinent MPD email accounts.

    (6) Jorge.Alma@dc.gov
    (7) george.crawford@dc.gov
    (8) Monique.Cesar@dc.gov
    (9) Thomas.McGuire@dc.gov
    (10) william.ponton@dc.gov
    (11) Winston.Robinson@dc.gov
    (12) Stanley.Wigenton@dc.gov
    (13) Nola.Joyce@dc.gov

On the same date, the undersigned requested that former Captain Diane Groomes be added to the list of mailboxes to be searched, and counsel for Defendant did not object to adding that email box to the email search.

On February 16, 2012, Defendant produced emails (Bates Nos. RN/FED 005570-RN/FED 005691) that Defendant uncovered associated with apparent email searches of Winston Robinson's email box (number 11, *supra*), which emails have nothing to do with the instant matter, and instead were simply a series of announcements on which Plaintiff was among dozens or hundreds of recipients concerning immaterial, general topics, such as, for example, Police and Fire Clinic Hours, overtime, fitness challenges, trainings, promotion processes, and shooting range qualifications. The emails, moreover, are only from 2008 and 2009.

On June 19, 2012, after countless attempts by the undersigned to obtain same from Defendant, Defendant produced additional emails pursuant to its January 25, 2012 indication that it would search the email boxes listed above. Although these emails appear to be consistent with the search in which Defendant indicated it would engage five months earlier, they do not contain innumerable emails *produced by Plaintiff* that would have been found pursuant to the search parameters agreed to by Defendant. In other words, there is no question that emails concerning Plaintiff and Plaintiff's claims were not preserved and/or were destroyed. For example, Plaintiff emailed former Assistant

Chief Winston Robinson on January 26, 2007 concerning her intention to file an EEOC retaliation complaint against then Captain David Kamperin and Captain Thomas McGuire and providing details regarding same. Plaintiff happened to retain a copy of this email and produced same to Defendant, Bates No. P000058. Defendant did not produce this email.

Additional examples follow. Plaintiff engaged in email correspondence with then MPD Chief Administrative Officer Nola Joyce, then Commander Mark Beach and Captain Melvin Gresham (all included on the email search list, *supra*) from February 2005 associated with MPD's directive that she not access certain MPD offices, her EEO complaint and a performance evaluation (which MPD later conceded was improperly conducted). Plaintiff produced this email correspondence at Bates No. P000989, though Defendant did not. Similarly, Plaintiff produced an email (Bates No. P001005) from her to Captain Gresham and then Commander Mark Beach indicating that MPD's restriction of Plaintiff's access to certain MPD officers (triggered by her EEO complaint against her former supervisor) was negatively impacting her ability to perform her duties. Defendant did not produce this document. There appear to be hundreds of emails to, from or cc'd to the individuals listed above, among others, produced by Plaintiff but not by Defendant.

These emails are responsive to the following Requests for Production propounded by Plaintiff, among others:

Plaintiff's First Set of RFP's, propounded on Defendant on June 18, 2011:

No. 22, "Produce any and all documents that tend to prove, disprove or negate the allegations contained in Plaintiff's Fourth Amended Complaint."

No. 23, "Produce any and all documents that tend to prove, disprove or negate the affirmative defenses contained in Defendant's Answer to Plaintiff's Fourth Amended Complaint."

No. 26, "Produce any and all documents regarding Plaintiff generated or received by Assistant Chief Diane Groomes."

No. 33, "Produce any and all documents regarding Plaintiff generated or received by former Commander David Kamperin," and

No. 35, "Produce any and all documents regarding Plaintiff generated or received by Assistant Chief Winston Robinson."

The deleted or otherwise missing emails are also responsive to Plaintiff's Second Set of RFP's, propounded on Defendant on November 23, 2011, including;

No. 3, "Please provide any and all documents provided and/or transmitted to, and/or received from, Defendant to George Crawford regarding Plaintiff."

No. 7, "Please provide copies of all letters and other correspondence engaged in between Plaintiff and each and every of the following: Chief Winston Robinson, Jackie Johnson, Inspector Stanley Wigenton, Nola Joyce, Commander Thomas McGuire, Commander Mark Beach, Captain Melvin Gresham, and Commander William Ponton."

No. 18, "Produce any and all documents concerning, demonstrating or in any way associated with Defendant's knowledge of Plaintiff's EEO complaints against Defendant, Phil Graham and/or other members and/or civilian employees of MPD."

No. 23, "Produce any and all documents concerning the determinations, considerations and correspondence related to discussions regarding assigning superiors, commanding officers, supervisors, managers and/or other bosses, whether first- or second-level, to Plaintiff, from January 1, 2001 to the present."

No. 24, "Produce any and all documents concerning the determinations, considerations and correspondence related to discussions regarding assigning inferiors and/or subordinates to Plaintiff, from January 1, 2001 to the present."

No. 25, Produce any and all documents concerning the determinations, considerations and correspondence related to discussions

and determinations concerning to whom Plaintiff's inferiors and/or subordinates must report, from January 1, 2001 to the present."

No. 26, "Produce any and all correspondence engaged in by any and all of Plaintiff's superiors concerning Plaintiff associated with any new duties, divisions, bureaus, supervisors, superiors and/or districts to which she was assigned. This request is limited to January 1, 2001 to the present."

No. 31, "Please provide any and all documents related to Plaintiff's actions related to rescuing an officer in a burning car, including but not limited to any investigations or attempted investigations associated therewith."

No. 36, "Please provide any and all documents related David Kamperin's instructions to and/or requests made of other officers concerning complaints lodged, to be lodged and/or contemplated to be lodged against Plaintiff."

No. 37, "Please provide any and all documents related to Plaintiff's request in 2005 that Mark Beach, Melvin Gresham, Thomas McGuire and/or David Kamperin investigate Plaintiff's allegations concerning an officer's attempt to access Plaintiff's personnel and/or financial records, including but not limited to any documents associated with any investigations, follow-up or actions taken in response to Plaintiff's request."

No. 38, "Please provide any and all documents related to Plaintiff's request in 2005 that Thomas McGuire and/or David Kamperin investigate Plaintiff's allegations concerning an officer's attempt to access Plaintiff's personnel and/or financial records, including but not limited to any documents associated with any investigations, follow-up or actions taken in response to Plaintiff's request."

No. 39, "Please provide any and all documents related Plaintiff's participation, or lack of participation, in selecting the personnel to be assigned to her unit(s) in 2006."

No. 41, "Please provide any and all documents related to Defendant's removal of Plaintiff in 2007 from supervisory authorities associated with the Electronic Surveillance Unit."

No. 42, "Please provide any and all documents related to David Kamperin's investigation and/or participation in any investigation of a complaint filed and/or lodged by Plaintiff against David Kamperin."

No. 47, "Please provide any and all documents related to correspondence between Plaintiff and William Ponton regarding police corruption, including but not limited to any followup, investigation, action(s) taken or other response(s) thereto or discussion(s) regarding same."

A review of the first approximately 1,700 of 9,800 documents produced to Defendant reveals countless emails that would have "shown up" in the email search in which Defendant indicated it engaged, associated with the above-listed individuals' email boxes, had Defendant preserved such emails. In addition to the foregoing examples, and with respect to the first 1,700 of 9,800 documents produced by Plaintiff, the undersigned has identified approximately 215 additional such emails. Although Plaintiff is not prejudiced by emails she happened to retain, there are doubtlessly hundreds, or thousands, of additional emails – to/from/cc'd/bcc'd to Plaintiff *or otherwise discussing Plaintiff* – many of which are relevant to this case, which have not been produced or preserved. It is simply impossible to know what was contained in those emails, much less any attachments to such emails.

In addition to destroyed or otherwise "unpreserved" emails, Defendant has not produced documents that must exist associated with Plaintiff's whistleblowing activity. For example, Plaintiff wrote to U.S. Senator Barbara A. Mikulksi (4th Am. Compl. ¶¶ 74, 87 and 88) concerning her mistreatment by MPD, including retaliation to which she had been subjected, to which Assistant Chief of Police Peter J. Newsham responded to the Senator on October 3, 2007. Plaintiff knows this because she obtained a copy of the response letter from MPD to the Senator, but Defendant has not produced that correspondence or the correspondence it received from the Senator to which its letter responded. Plaintiff produced this letter from MPD to the Senator at Bates No. P006323.

Such documents would be responsive to Plaintiff's First Set of Requests for Production No. 11, "Produce any and all documents associated with Plaintiff's complaints to, communications with and/or testimony before the D.C. City Council, Councilmember Mary Cheh, Senator Barbara Mikulski, Eleanor Holmes Norton, the Inspector General for the District of Columbia, the Mayor of the District of Columbia and IAD. This document request shall be limited to January 1, 2003 to the present." As with the emails discussed *supra*, Plaintiff cannot know what additional documents exist(ed) associated with her communications with and/or testimony before the D.C. City Council "regarding corruption, illicit conduct and unethical activities within the Department." (4th Am. Compl. ¶ 72). Nor can she know what additional documents exist(ed) associated with other correspondence in which she engaged with political figures/bodies and others that she asserts were protected activities pursuant to the District of Columbia Whistleblower Protection Act, as amended, D.C. Code § 1-615.54 *et seq.*, "including protected disclosures as defined by the Act and its 2009 Amendment." (4th Am. Compl. ¶ 84).

In the same vein, Plaintiff made numerous referrals to Internal Affairs in her capacity as a Lieutenant in the Major Narcotics Division of MPD. Although Defendant has produced some copies of those referrals and the subsequent investigations by Internal Affairs, it has provided a minority of such referrals initiated by Plaintiff – referrals that would be protected by the D.C. Whistleblower Protection Act, as amended. Plaintiff provided dates she initiated those referrals, as well as case numbers as to several of the referrals and other information so that Defendant may locate those documents. Although Defendant has indicated to the undersigned for months that it would provide an affidavit associated with Defendant's unsuccessful search for the vast majority if not nearly all of

the referrals provided to Defendant, no such affidavit has been provided and the documents remain unproduced. To the extent relevant, Defendant's 30(b)(6) Internal Affairs designee, Lieutenant Samuel Golway, testified at his deposition (Golway Trans. at 35) that he thought that IAD is "supposed to" maintain copies of each investigation for 75 years or longer.

In light of the foregoing flagrant document omissions/destruction, Plaintiff cannot know what other relevant documents have been destroyed or otherwise not preserved associated with the instant case or the internal and other external (e.g., OHR) complaints she has made against Defendant.

**SANCTIONS ASSOCIATED WITH A PARTY'S SPOLIATION OF EVIDENCE**

The deletion of emails and destruction (or non-preservation) of documents calls into question what documents may have been lost or destroyed. Plaintiff cannot and does not know the scope of what she has not been provided. Moreover, there is no reasonable alternative to Plaintiff associated with gathering evidence other than production of the actual destroyed documents. As such, the harshest but most fair and appropriate manner in which such conduct can be appropriately addressed and deterred is the entry of a default judgment against the District, as opposed to ordering an adverse inference.

In deciding whether a default judgment is appropriate, courts consider "the effect of a [party's] dilatory or contumacious conduct on the court's docket, whether the [party's] behavior has prejudiced the [other party], and whether deterrence is necessary to protect the integrity of the judicial system." *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167 (D.C. Cir. 1990) (*citing Shea v. Donohoe Constr. Co.*, 795 F.2d 1071 (D.C. Cir. 1986)). In the case at bar, Defendant's responses to Plaintiff's First and Second Sets of

Interrogatories each took approximately 5-1/2 months to produce, verified by "Paralegal Specialists"[3] within the Office of General Counsel and were only produced after Plaintiff was forced to file two Motions to Compel associated with same. *See also* footnote 5 herein, which discusses Defendant's failure to supplement its discovery notwithstanding the Court's recent October 2, 2012 Order that it do so, as well as Defendant's failure to respond to Plaintiff's requests concerning the status of said documents.

In *Shea v. Donohue Constr. Co.*, 795 F.2d 1071, 1075 (D.C. Cir. 1986), the court held that where the behavior of one party causes the other party "severe prejudice in his ability to present his case, dismissal has been upheld." "Moreover, even without a showing of actual prejudice, we agree, as at least two of our sister circuits have held, that 'prejudice to defendants resulting from unreasonable delay may be presumed,' and that there is no hard and fast requirement that the party aggrieved by such unreasonable delay always presents specific evidence of the exact nature of the prejudice." *Id.* (*quoting Lyell Corp. v. Lowes Corp.*, 682 F.2d 37, 43 (2nd Cir. 1982) and several other cases). Here, in addition to significant delays and missed deadlines imposed by the Court, Defendant's delays in providing material, responsive information is indefinite and infinite in that the documents discussed *supra* have never been provided and appear to have been destroyed.

*Shea* also discusses prejudice to the judicial system and deterrence and punishment in its analysis concerning whether a default judgment is appropriate. With respect to the effect on the judicial system, the District's dilatory tactics and failure to

---

[3] In *Sorrell v. District of Columbia*, 252 F.R.D. 37 (D.D.C. 2008), which was before Judge Friedman, the Court admonished the District for having paralegals verify Interrogatory responses and required the District to have a representative of the District of Columbia who can attest to the trust of the responses on behalf of the District. *See also*, *Fonville v. District of Columbia*, 230 F.R.D. 38, 45 (D.D.C. 2005) ("[H]aving a paralegal sign answers to Interrogatories is utterly improper").

preserve hundreds, if not thousands, of relevant documents argues in favor of entering a default judgment. The District's significant delays in responding to discovery requests – taking more than five times longer than the Federal Rules of Civil Procedure permit to respond to Interrogatories and then having a paralegal specialist virfy same – but more dramatically its failure to preserve documents that could easily include "smoking gun" evidence in Plaintiff's favor, has delayed the progress of this case and is consistent with the District's tactics in countless other cases before this Court. Moreover, as this Court determined in *Monroe v. Ridley*, 135 F.R.D. 1, 6 (D.D.C. 1990), permitting a defendant to take advantage of, delay and/or ignore its obligations associated with discovery discourages other plaintiffs who may contemplate bringing lawsuits against the District of Columbia. If Defendant's behavior is condoned or otherwise permitted, litigants and their attorneys will be dissuaded from pursuing cases that would benefit the public interest in that the failure to preserve or the destruction of evidence, coupled with delays and repeated discovery disputes, would – as has been the case here – cause the focus and time of the Court and the litigants to be on issues other than the merits of a case. This is especially the case with respect to pro bono, contingency fee and/or public interest arrangements with lawyers. The entry of a default judgment is thus appropriate to afford meaningful access to a crowded court system to other potential plaintiffs. *See Shea*, 795 F.2d at 1076.

"Drawing upon District of Columbia law, courts have found that 'bad faith' destruction or concealment of evidence encompasses both 'deliberate' destruction or concealment, and destruction or concealment with 'reckless disregard' for the relevance of the evidence." *More v. Snow*, 480 F. Supp.2d 257, 274-75 (D.D.C. 2007) (*citing Rice*

*v. United States*, 917 F. Supp. 17, 19 (D.D.C. 1996)). "In addition, a court may employ an adverse inference due to a party's 'failure to preserve evidence,' even if deliberate or reckless conduct is not present." *Id.* at 275 (*citing Rice*, 917 F. Supp. at 19-20). "In doing so, the court should consider the 'degree of negligence or bad faith involved, the importance of the evidence involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point." *More,* 480 F. Supp.2d at 275 (*citing Rice*, 917 F. Supp. at 20, which in turn was quoting from *Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766-67 (D.C. 1990)).

In *Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp.2d 282 (2008), this Court set out the elements of an adverse inference inquiry associated with purported spoliation of evidence by a party. The elements outlined in that case are: whether Defendant was obligated to preserve the evidence at issue; whether Defendant destroyed the evidence (or allowed it to be destroyed) with a sufficiently "culpable mind" (which includes the notion of *negligent destruction* and not simply deliberate); and what the relevance is of the destroyed evidence (that is, whether a reasonable factfinder could infer that the evidence would have been of the nature purported by the party affected by its destruction). *Id.* at 291-93. *See also Smith v. Napolitano*, 626 F. Supp.2d 81, 101 (D.D.C. 2009) and *Bolger v. District of Columbia*, 608 F. Supp.2d 10, 58 (D.D.C. 2009) (the fact that the District did not act with "gross negligence or bad faith" is "of no moment" because "'the adverse inference doctrine embraces negligent (in addition to deliberate) destruction of evidence) (*quoting Mazloum*, 530 F. Supp.2d at 292 and citing to *More*, 480 F. Supp. 2d at 275). *See also Chen v. District of Columbia*, 839 F. Supp.2d 7, 11-12 (D.D.C 2011), in which

this Court (and Judge Friedman) found Red Roof to have exhibited a "cavalier attitude" toward its discovery obligations, and that its conduct was not "not merely negligent, but grossly negligent" because there appeared to be no evidence and no claim by Red Roof that it "took steps to discuss the company's obligations to preserve evidence" with a general manager or its other employees.[4]

Indeed, an adverse inference remedy is required where document destruction is permitted with reckless disregard for the relevance of evidence to a plaintiff's claims. *See Rice v. United States*, 917 F. Supp. 17, 20 (D.D.C. 1996). Such an inference is appropriate when a party has destroyed evidence over which it has control and which the party had an obligation to preserve when it was destroyed. *See Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp.2d 282, 290 (D.D.C. 2008).

The following adverse inferences, among others, are tied directly to the destroyed or otherwise "missing" evidence: that the hundreds of missing emails and documents would have been unfavorable to the Defendant's position and would have provided unfavorable information associated with Defendant's retaliatory actions in response to Plaintiff's EEO and whistleblower activities (4th Am. Compl. ¶¶ 35, 53, 63, 65, 71, 72, 77, 78, 87 and 89), failure(s) to properly investigate her complaints of retaliation (4th Am. Compl. ¶¶ 30, 35, 54 and 78), transfers and/or reassignments to less desirable positions and duties (4th Am. Compl. ¶¶ 10, 11, 23, 29, 48 and 89), attempts to find wrongdoing on her part or to otherwise discredit or harm Plaintiff by instructing her colleagues to target

---

[4] *Chen* cites to other cases relied upon in this Motion, including *More v. Snow*, 480 F. Supp. 2d 257, 275 (D.D.C. 2007) (for the notion that an adverse inference may be appropriate in the absence of deliberate or reckless conduct). *Chen* also cites to *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) for the notion that ordinary negligence suffices for any requirement that there be a "culpable state of mind"

her (4th Am. Compl. ¶¶ 16, 21, 24, 34 and 44), provision of low performance ratings (4th Am. Compl. ¶ 17 and below average performance rating not known to Plaintiff until the evaluation by Kamperin was provided by Defendant during discovery), placement of Plaintiff in a utility closet office (4th Am. Compl. ¶¶ 10, 20, 29 and 32), office break-ins (4th Am. Compl. ¶¶ 18, 22, 32 and 33), failure to recognize Plaintiff for saving a fellow officer's life and instead commencing an investigation of her for purportedly being in a location other than where she was supposed to be situated (4th Am. Compl. ¶ 21), failure(s) to keep Plaintiff's EEO complaint(s) confidential (4th Amend. Compl. ¶¶ 9 and 10), significant delays in advising Plaintiff of the results of her EEO complaints and those of others against her, significant delays in processing her leave, retirement and workers' compensation applications (some delays were measured in years, not months), sometimes causing Plaintiff to be receive no pay whatsoever during such delays (4th Am. Compl. ¶¶ 25, 70 and 78), permanent removal from her position in the Information Technology Division after she filed an EEO complaint against her supervisor (Plaintiff's EEO complaints were sustained, her supervisor terminated and she was nonetheless never returned to her position in IT) (4th Am. Compl. ¶ 23), barring Plaintiff from certain MPD offices even after the purported reason for doing so had been resolved (her supervisor's termination) (4th Am. Compl. ¶¶ 15 and 36), failure to permit Plaintiff from selecting her own subordinate staff (4th Am. Compl. ¶ 37), removal of her purchase order authority (4th Am. Compl. ¶ 39), removal of her authority to supervise the Electronic Surveillance Unit (4th Am. Compl. ¶ 46), confiscation of her Department-issued vehicle (4th Am. Compl. ¶ 51), release of her confidential medical/psychological records (4th Am. Compl ¶ 55) and repeated denial of her leave requests (Am. Compl. ¶ 60).

Defendant became aware of internal and external complaints by Nunnally, at least with respect to discrimination and Title VII and/or D.C. Human Rights Act retaliation, as far back as May 2004, when she filed her initial EEO complaint with MPD's EEO office; she followed that complaint with internal (EEO office) and external (OHR and D.C. Superior Court) retaliation complaints. It is, moreover, perplexing and troubling that a sophisticated defendant such as the District of Columbia would fail to take any steps to preserve documents for subsequent litigation. In addition, not only did Defendant fail to preserve innumerable – hundreds or even thousands – of emails and other documents, but it appears to have either affirmatively deleted those emails or to have knowingly permitted their purging and/or deletion.[5] Indeed, it would appear that the emails and documents at issue may no longer exist because of a failure to suspend routine purging procedures, even well after the instant lawsuit was filed, and certainly after Nunnally's D.C. Superior Court lawsuit and OHR complaints were filed, as well as her internal MPD EEO and IAD retaliation complaints.

As such, if this Court is not inclined to impose a default judgment, the Court should, at a minimum, impose an adverse inference associated with the pending summary judgment motion and/or associated with trial, that these emails and other documents known to have been generated but that are now "missing" are detrimental to Defendant and its positions.

---

[5] Defendant has repeatedly advised the undersigned that it would provide an affidavit associated with its search for emails and Internal Affairs investigations referred by Plaintiff to MPD's Internal Affairs Division. Most recently, Defendant advised that such affidavits would be provided to Plaintiff, along with certain other supplemental discovery, by no later than October 12, 2012 (*See* October 2, 2012 Minute Order, which ordered Defendant to provide supplemental discovery by October 12, 2012; Defendant has not done so, despite unanswered emails to Defendant from the undersigned requesting the status of same).

An adverse inference is appropriate in this case because, as outlined *supra*, Defendant had an obligation to preserve the emails and other documents at issue when it learned about the instant litigation *as well as* other lawsuits and complaints filed against Defendant and/or its officials. Such actions by a sophisticated Defendant should not be excused as simple negligence.

All told, Plaintiff requests that this Court impose appropriate sanctions against the District. The court is presented with several options involving discovery abuse and/or spoliation, from a default judgment (the most extreme) to the least effective, that is, simply admonishing Defendant not to repeat such practices. *Donato v. Fitzgibbons*, 172 F.R.D. 75, 81 (S.D.N.Y. 1997). With respect to the discretion the Court has associated with the issuance of the appropriate sanction(s), the U.S. Supreme Court opined, in *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642-43 (1976), that "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."

In adopting this deferential standard, the U.S. Court of Appeals for the District of Columbia stated, in *Founding Church of Scientology of Washington, D.C. v. Webster*, 802 F.2d 1448, 1457 (D.C. Cir. 1986): "We rightly pay great deference, as the abuse-of-discretion standard itself suggests, to the District Court's determination in such instances. Implicit in the governing standard is the recognition that the trial court has a better 'feel,' as it were, for the litigation and the remedial actions most appropriate under the circumstances presented…"

Both *National Hockey League* and *Webster* are discussed in *Webb v. District of Columbia*, 189 F.R.D. 180 (D.D.C. 1999), which then recited a long history of discovery sanctions against the District of Columbia, a history that has repeated itself in this case and in numerous additional federal court cases since *Webb* was decided in 1999. *See, e.g., Act Now to Stop War and End Racism Coalition, et al. v. District of Columbia*, 2012 U.S. Dist. LEXIS 143568 (D.D.C. October 4, 2012). The "determination of an appropriate discovery sanction is left to the discretion of the trial court", and a Court's decision can only be reversed if its actions were "clearly unreasonable, arbitrary or fanciful." *Hull v. Eaton Corp.*, 825 F.2d 448, 452 (D.C. Cir. 1987) (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984)).

Other remedies available to a party affected by the spoliation of evidence by another party include preclusion, reimbursement of fees and costs and deterrent monetary sanctions. The Court may also impose a combination of sanctions. *Bolger*, 248 F.R.D. at 343. Courts often issue orders precluding certain evidence from being offered as a sanction for discovery abuses. *See Donato*, 172 F.R.D. at 84. In the instant case, in light of Defendant's conduct and failure to preserve a tremendous amount of relevant evidence, the District should be precluded from presenting evidence that it took adverse actions against Plaintiff for legitimate reasons, and that it was unaware of the protected activities in which Plaintiff engaged.

The Court may also require Defendant to reimburse Plaintiff for her attorneys' fees and costs associated with this Motion and Plaintiff's related attempts to secure the destroyed documents. Further, the Court may sanction Defendant via deterrent monetary sanctions. For example, in *In re Prudential Insurance Co.*, 169 F.R.D. 598, 617 (D.N.J.

1997), the court indicated that such a sanction is appropriate given the spoliating party's document destruction. In its ruling, the Court noted that such a sanction acknowledges the "unnecessary consumption of the Court's time and resources in regard to the issue of document destruction" and that the sanction informed the party that destroyed the evidence "and the public of the gravity of repeated incidents of document destruction and the need of the Court to preserve and protect its jurisdiction and the integrity of the legal proceedings before it." *Id.*

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Court order an appropriate sanction in light of the spoliation and other discovery abuses detailed *supra*.

Respectfully submitted,

ALDERMAN, DEVORSETZ & HORA PLLC

/s/

T. Cary Devorsetz (D.C. Bar No. 475070)
1025 Connecticut Avenue, NW
Suite 615
Washington, DC 20036
cdevorsetz@adhlawfirm.com
Phone: (202) 969-8220
Fax: (202) 969-8224